Robert T. BIVENS, Plaintiff,

v.

**Willie G. BLACK, Defendant.**

No. 3:97–CV–115.

United States District Court,
E.D. Tennessee.

Feb. 9, 1999.

W. Holt Smith, Madisonville, TN, Dennis B. Francis, Lockridge, Becker & Valone, PC, Knoxville, TN, Randy G. Rogers, Athens, TN, for Robert T. Bivens and Savannah R. Bivens.

Dallas T. Reynolds, III, Dunn, MacDonald & Coleman, PC, C. Clifford Shirley, Jr., Lowe, Shirley & Yeager, Knoxville, TN, for Willie G. Black and Nationwide Mut. Ins. Co.

Michael A. Anderson, Horton, Maddox & Anderson, PLLC, Chattanooga, TN, for Blue Cross Blue Shield of Tennessee.

## MEMORANDUM AND ORDER

MURRIAN, United States Magistrate Judge.

This matter is before the undersigned in connection with the plaintiffs' motion for a new trial pursuant to Fed.R.Civ.P. 59 [Doc. 38]. The defendant has responded and opposes the motion [Doc. 42]. Supplemental briefs were filed after oral argument was heard on January 14, 1999 [Docs. 45, 46]. The plaintiffs seek a new trial on the basis of inadequacy of the verdict. This case was tried before a jury on December 7 and 8, 1998, and resulted in a verdict in favor of the plaintiffs in the amount of $14,622.08 for plaintiff Robert Bivens, $7,621.84 for plaintiff Savannah Bivens, and $995.66 for plaintiff Jonathan Bivens. The verdict was in the exact amount of the medical expenses of Savannah and Jonathan Bivens and was slightly less than the medical expenses proved by the plaintiff Robert Bivens. All three of the plaintiffs were injured when the vehicle in which they were riding was struck in the rear on Interstate 40 in Loudon County, Tennessee. Their vehicle was struck by defendant's 1987 Dodge Ram pickup truck causing the plaintiffs' Ford Explorer vehicle to strike the concrete divider of I–40. The defendant, Willie G. Black, was arrested at the scene for drunk driving and later pled guilty to drunk driving. The defendant admitted liability at trial and the case was tried on the question of compensatory and punitive damages. The plaintiffs have not sought a new trial on the question of punitive damages and that is not currently before the undersigned.

There is no evidence contrary to plaintiffs' evidence in this case that Robert Bivens was airlifted from the scene of the accident after suffering serious injuries to his back. He suffered a compression fracture to his L1 vertebra as a result of the accident. Deposition of William L. Harvey, M.D., taken November 19, 1998, at 6. All three family members testified that the automobile came to rest in the emergency lane adjacent to the concrete divider and that for a period of time no one stopped to help them. The defendant continued on in his truck until another motorist, Robert E. Rittenhouse, pulled in front

of the defendant's vehicle and eventually stopped him in the emergency lane on the right hand side of the highway. Rittenhouse described the defendant in his testimony at trial as very inebriated and unwilling at first to return to the scene of the accident. Rittenhouse convinced him to return to the scene of the accident.

All of the members of the Bivens family testified to the fear and trauma that they suffered as cars sped past in the lane just adjacent to theirs after the accident. Mrs. Bivens was unconscious at first and Mr. Bivens was unable to remove himself from the seat of the car because of his broken back. He finally crawled out of the car and laid beside the concrete barrier in a great deal of pain. He also said that he was concerned that his son would be injured after he got out of the car and was trying to flag traffic down. Robert C. Jackson, M.D., an orthopedic surgeon, treated Mr. Bivens after the accident. He assigned Mr. Bivens a permanent impairment to the body as a whole of 10% from his L1 compression fracture and also a 5% impairment to the body as a whole as a result of a cervical strain resulting from the accident. Deposition of Robert C. Jackson, M.D., taken November 9, 1998, at 16. He also opined that Mr. Bivens would not be able to return to his usual work as a wrecker driver and body work technician. *Id.*

Peter Stimpson, M.D. began treating the plaintiff in January of 1998 for chronic back pain and neck pain. Dr. Stimpson placed lifting restrictions on the plaintiff of a maximum of 30 pounds and not to lift over 20 pounds on a repetitive basis and not to stand for more than four hours at a time. He was also to avoid repetitive bending, repetitive stooping, repetitive squatting, prolonged walking and climbing. He assessed his permanent impairment to the body as a whole as a result of the accident as 10%. Deposition of Peter G. Stimpson, M.D., taken November 24, 1998, at 13.

Mr. Bivens is in the wrecker business and body shop business and has been for a long time. He testified that he has never been able to go back to full time work in either business because of his physical limitations.

As indicated, Mrs. Bivens was knocked unconscious in the wreck and was taken by ambulance to the University of Tennessee Hospital. She was admitted overnight and then released. She had a laceration to her scalp which was stapled. She had a series of x-rays and other studies of her chest and shoulders. She suffered an injury to her right arm and wrist and sustained some severe contusions and bruises. She had sustained trauma to her chest wall but had no obvious fracture. She suffered a hyperextension injury to her right wrist and hand. Her ribs were quite painful for a period of time after the accident. Deposition of William L. Harvey, M.D., taken December 2, 1998, at 6–8. Mrs. Bivens also had a laceration to her lip and damage to two teeth. She received physical therapy on her wrist.

Jonathan Bivens was the least injured of the plaintiffs. He described his injuries as a head laceration, two sprained fingers and a sprained back. He said that he received 10 stitches at the hospital and was released. Apparently his injuries have resolved very well.

Jurisdiction in this case is based upon the diversity of citizenship and the amount in controversy. 28 U.S.C. § 1332. Trial courts exercising diversity jurisdiction must look to state law for guidance on questions such as the excessiveness or inadequacy of the verdict. *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

> The real importance of the *Gasperini* decision ... lies in its practical implications for the federal court system, in that the Court announced new standards of review for new trial motions on excessiveness grounds in federal court. First, *Gasperini* held that a federal trial court must apply state substantive law governing excessiveness of jury verdicts. Second, the court held that the Re-examination Clause permits appellate review of such trial court determinations but limits this review to a narrow abuse-of-discretion standard. These new standards have immediate consequences for the federal court system, and federal courts in Arkansas, as well as those across the nation, should take note of

the importance of the *Gasperini* holding and adjust their practices accordingly.

*Eva* Madison, *The Supreme Court Sets New Standards of Review for Excessive Verdicts in Federal Court in Gasperini v. Center for Humanities, Inc.*, 50 Ark. L.Rev. 591, 627–628 (1997). In *Gasperini*, New York state law had been changed to provide that appellate courts in New York reviewing claims that jury verdicts were either excessive or inadequate were to determine if the award "deviates materially from what would be reasonable compensation."

This standard was in contrast to the one used in the federal courts, and most state courts, which review the size of the verdict as to whether the amount awarded "shocks the conscience" and thus it authorized much greater judicial control over the verdict.

Justice Ginsburg, writing for the majority, held that New York's law had both substantive and procedural aspects; substantive in the sense that it was directed to curbing jury verdicts and the amount of damages awarded and thus was outcome-determinative and procedural in the sense that it assigned the decision-making authority on that question to the New York appellate courts. She then went on to hold that, therefore, the trial court in deciding whether to grant a new trial should have applied the New York standard, but ... the appellate court was limited by the Seventh Amendment in reviewing that decision to an abuse of discretion standard and could not independently apply the New York standard as a means of review.

Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2802 (1998 Supp.). Although *Gasperini* dealt with a verdict that was allegedly excessive, the case applies equally in diversity cases where a post-trial motion raises the issue of the alleged inadequacy of a verdict. *Gasperini* holds that federal trial courts exercising diversity jurisdiction must look to state law in analyzing the division of power between judges and juries with regard to the size of verdicts.

 Under Tennessee substantive law "[t]he power of a trial judge to disturb a verdict because of his dissatisfaction with the amount of damages rests ... on more than a century of precedent and practice." *Foster v. Amcon Intern., Inc.*, 621 S.W.2d 142, 144 (Tenn.1981).

Our appellate courts have consistently held that the amount of compensation in a personal injury case is primarily for the jury, and that next to the jury, the most competent person to pass on the matter is the trial judge who presided at the trial and heard the evidence.

*Id.* at 143–44. Under Tennessee substantive law the trial judge exercises the function of a thirteenth juror. It is his or her duty to weigh the evidence and if he or she is dissatisfied with the verdict of the jury it should be set aside. *Cumberland Telephone & Telegraph Co. v. Smithwick*, 112 Tenn. 463, 468–70, 79 S.W. 803 (1904). Under Tennessee law if a trial judge approves the verdict this invokes the "material evidence rule" and limits the appellate court's analysis to whether the record reflects material evidence demonstrating that the jury's award is at or above the lower limit of the range of reasonableness, giving full faith and credit to all the evidence that tends to support that amount. *Miller v. Williams*, 970 S.W.2d 497 (Tenn. App.1998), *permission to appeal denied, id.* Thus, it is clear that under Tennessee substantive law trial judges are given considerable discretion in granting new trials if they are dissatisfied with the inadequacies or excessiveness of a verdict. Justice Scalia, writing in dissent in *Gasperini*, states that "[t]he Court ... holds today that a state practice that relates to the division of duties between state judges and juries must be followed by federal courts in diversity cases." 116 S.Ct. at 2230. This states one of the holdings in the case about as plainly as it can be stated, *i.e., Gasperini* authorizes federal trial judges sitting in diversity cases to exercise the same control over the size of jury verdicts as is granted to the state trial judges.

In the case of *Tatum v. Land,* 107 F.3d 871, 1997 WL 85144, an unreported decision from the United States Court of Appeals for the Sixth Circuit, the court stated the following:

In diversity cases, district courts must apply the "damage-control standard state law supplies," subject to federal appellate review for abuse of discretion. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 2225, 135 L.Ed.2d 659 (1996). In *Gasperini,* New York statutory law required a determination that an award was excessive if it "deviates materially from what would be reasonable compensation." Concluding that this standard required closer court review than the traditional "shock the conscience" test, *id.* at 2220, the court held that *Erie [v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ] principles required application of the New York standard, which was arguably part of a procedural statute, because to hold otherwise could result in larger recoveries in federal court than those which a state court could entertain. *Id.* at 2221.

107 F.3d 871, 1997 WL 85144, n. 8. The Court in *Tatum* went on to apply an abuse of discretion standard in reviewing the trial judge's decision in that case in failing to order a remittur or to grant a new trial.

It has been traditionally the standard in federal court in Tennessee that it is the duty of a trial judge to set aside a verdict and grant a new trial if the judge is of the opinion that the verdict is against the great weight of the evidence or if a miscarriage of justice would result if a new trial was not granted. *Turner v. United States,* 139 F.Supp. 30 (E.D.Tenn.1954), *aff'd* 229 F.2d 944 (6th Cir.), *cert. denied,* 351 U.S. 970, 76 S.Ct. 1038, 100 L.Ed. 1489 (1956); *see also Sandlin v. Pearsall,* 427 F.Supp. 494 (E.D.Tenn. 1976).

■ The undersigned is of the opinion that for the reasons stated herein, a new trial must be granted in this case under either the relaxed standards of *Gasperini* or under the traditional standards as stated in *Turner v. United States, supra.*

The defendant correctly points out in opposition to the motion for a new trial that very serious credibility problems were raised with regard to the testimony of Mr. and Mrs. Bivens. For example, Mrs. Bivens claimed injuries primarily to her shoulder and back, but her own treating physician and family doctor refused to relate her back injury to the accident. Additionally, on cross-examination she was impeached with inconsistencies between her testimony about her back injury and the testimony of her treating physician. Dr. Harvey testified that he did not believe that she has any sort of permanent injury as a result of the accident. Deposition of William L. Harvey, M.D., taken December 2, 1998, at 25. She was released from physical therapy on April 26, 1996, and had full range of motion in her shoulder without pain. *Id.* at 24. She testified at trial that her shoulder had not completely healed. The first time that she mentioned any back pain to him was July 16, 1996, some five months after the accident. *Id.* at 27. She also testified that she had injured her back in the accident, but Dr. Harvey would not relate her back complaints to the accident. *Id.* at 31. She testified at trial that she wasn't sure whether or not she had seen Dr. Harvey prior to the date of the accident for back problems but was cross-examined with his notes which indicate that she had an injection in her spine only six months prior to the accident for back pain. Plaintiffs' Exhibit 4. The evidence showed that she had injured her back some time prior to the accident and had been diagnosed in October of 1993 by an orthopedic surgeon with "chronic lumbar syndrome."

There was evidence before the jury that Mr. Bivens had exaggerated his injuries for purposes of maximizing his recovery in the lawsuit. His own treating physician, Dr. Harvey, stated in a deposition that there was "just an explosion of symptoms as the time for litigation approached." Deposition of William L. Harvey, M.D., taken November 19, 1998, at 31. Dr. Harvey described Mr. Bivens as a "fine gentleman" with a "significant injury," and said that he had a "prolonged recovery period … a lot of pain … [and] he missed a lot of income…." *Id.* at 19. Dr. Harvey said that he didn't hear about the complaints of neck pain and neck problems for so long after the accident that that "just didn't go down well with" him. *Id.* at 25. He examined Mr. Bivens 19 times after the accident and testified that he finally

told Mr. Bivens that he was a busy physician and could do nothing further for him.

Mr. Bivens was also impeached significantly in front of the jury in connection with his claim that he had lost a significant amount of income due to the accident. At best, the evidence he presented was muddled and confusing. At worst, it demonstrated a lack of candor.

In any event, suffice it to say that the impeachment of Mr. and Mrs. Bivens' testimony and the appearance that they tried to make their case better than it actually was obviously influenced the jury in a very negative way. That, alone, would not be grounds for a new trial. This is a case of admitted liability, in which the plaintiffs' vehicle was struck from the rear by a drunk driver, in which significant damage was done to their vehicle, in which Mr. Bivens' back was broken and he suffered a permanent injury, and in which Mrs. Bivens was knocked unconscious and suffered injuries to her head, shoulder, hand, and wrist. Failure to award Mr. Bivens anything for his permanent injury, and failure to award the three plaintiffs any damages for pain and suffering and mental anguish would amount to a miscarriage of justice. Although Jonathan was not seriously injured, he should also be awarded a new trial because the undersigned has no doubt that he suffered some pain and some mental anguish as a result of this accident.

For the reasons indicated, it is **ORDERED** that the plaintiffs' motion for a new trial on the question of compensatory damages only be, and it hereby is, **GRANTED.** This case is hereby reset for trial and will commence on **Monday, May 3, 1999, at 9:00 a.m.** before the undersigned and a jury. If this trial date is not convenient with counsel, they should contact the undersigned's staff by conference call within five days of receipt of this Memorandum and Order.

**IT IS SO ORDERED.**